Daniel D. Harshman (SBN# 177139)
Charles Wheeler (SBN# 82915)
COZEN O'CONNOR
425 California Street, Suite 2400
San Francisco, CA 94104
Telephone: (415) 617-6100
Facsimile: (415) 617-6101
E-mail: dharshman@cozen.com

Attorneys for Defendant
PSI CORPORATION

## IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FRIENDLYWAY, AG, a German corporation,<br><br>    Plaintiff,<br><br>  v.<br><br>PSI CORPORATION, a Nevada corporation f/k/a FRIENDLYWAY CORPORATION f/k/a BIOFARM, INC.; and DOES 1-20,<br><br>    Defendant. | Case No. 3:07-CV-02990-MEJ<br><br>**ANSWER, AFFIRMATIVE DEFENSES AND COUNTERCLAIM**<br><br>JURY TRIAL DEMANDED |

## INTRODUCTION

Defendant, PSI Corporation ("Defendant" or "PSI"), hereby responds to the Complaint of Plaintiff friendlyway AG ("Plaintiff" or "FWAG") and asserts its affirmative defenses and counterclaims as described below:

### Preliminary Statement

1.      The allegations contained in Paragraph 1 state conclusions of law to which no response is required. To the extent any response is required, the allegations are specifically denied.

### Parties

2.      Upon information and belief, the allegations contained in Paragraph 2 are admitted.

3.      Admitted.

4.      The allegations contained in Paragraph 4 state conclusions of law to which no response is required. To the extent any response is required, the allegations are specifically denied.

1

<strong><u>Venue</u></strong>

2      5.     The allegations contained in Paragraph 5 are conclusion of law, to which no response

3   is required.

4                            <strong><u>Factual Allegations</u></strong>

5      6.     Upon information and belief, the allegations contained in Paragraph 6 are admitted.

6      7.     PSI lacks information or knowledge sufficient to form a belief as to the truth or falsity

7   of the allegations contained in Paragraph 7.

8      8.     PSI admits that, in August of 2004, it agreed to acquire all outstanding shares of FWI

9   in exchange for 18,000,000 shares of Biofarm, Inc. (now PSI).  PSI denies any implication that the

10  consideration tendered by FWAG, Alexander von Welczeck ("von Welczeck"), FWI, or its other

11  shareholders was sufficient or that the agreement is valid and enforceable.

12     9.     Admitted.

13     10.    Admitted.

14     11.    Denied, upon information and belief.

15     12.    The allegations contained in Paragraph 12 purport to recite and/or characterize the

16  contents of a written document.    The written document speaks for itself.    PSI denies any

17  characterization or implications drawn from that written document by FWAG.

18     13.    Denied.

19     14.    PSI lacks information or knowledge sufficient to form a belief as to the truth or falsity

20  of the allegations contained in Paragraph 14.

21     15.    PSI lacks information or knowledge sufficient to form a belief as to the truth or falsity

22  of the allegations contained in Paragraph 15.

23     16.    Denied, upon information and belief.

24     17.    PSI lacks information or knowledge sufficient to form a belief as to the truth or falsity

25  of the allegations contained in Paragraph 17.

26     18.    Admitted.

27

28

2

19.    To the extent the allegations contained in Paragraph 19 refer to and/or characterize a written document, the written document speaks for itself. By way of further response, PSI states that any such subscription agreement was void and unenforceable.

20.    To the extent the allegations contained in Paragraph 20 refer to and/or characterize a written document, the written document speaks for itself. By way of further response, PSI states that any such subscription agreement was void and unenforceable.

21.    To the extent the allegations contained in Paragraph 21 refer to and/or characterize a written document, the written document speaks for itself. By way of further response, PSI states that any such subscription agreement was void and unenforceable.

22.    The allegations contained in Paragraph 22 do not require a response.

23.    The allegations contained in Paragraph 23 state conclusions of law to which no response is required. To the extent any response is required, the allegations are specifically denied.

24.    PSI lacks sufficient information or belief to either admit or deny the allegations contained in Paragraph 24.

25.    Admitted.

26.    PSI denies that Kenneth J. Upcraft ("Upcraft") acquired 2 million shares of PSI stock in exchange for his shares of capital stock in Pantel Systems, Inc. Instead, a certain percentage of Upcraft's stock was held in escrow. PSI admits that, with 2 million shares of PSI stock, Upcraft became the company's largest single stockholder. PSI admits that, following the transaction with Pantel Systems, Upcraft became the company's president and chief executive officer. PSI denies that Upcraft had sole or exclusive power to exercise control over the company.

27.    PSI lacks information or knowledge sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 27.

28.    PSI lacks information or knowledge sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 28.

3

29.    PSI admits that a Form 8-K on file with the SEC states that PSI canceled 15,560,000 shares of PSI stock on August 15, 2006.  PSI lacks information or knowledge sufficient to form a belief as to the truth or falsity of the remaining allegations contained in Paragraph 29.

30.    The allegations contained in Paragraph 30 state conclusions of law to which no response is required.  To the extent any response is required, the allegations are specifically denied.

31.    Admitted.

32.    PSI admits that it issued to FWAG certificates representing the issuance of 2,318,575, 1,250,000, and 833,333 shares of stock, respectively.  PSI lacks information or knowledge sufficient to form a belief as to the truth or falsity of the remaining allegations contained in Paragraph 32.

## FIRST CAUSE OF ACTION
### (Breach of the 2004 Share Exchange Agreement)
### (Cancellation of Shares)

33.    Defendant references and incorporates it responses to paragraphs 1-32 above.

34.    Denied.

35.    The allegations contained in Paragraph 35 state conclusions of law to which no response is required.  To the extent any response is required, the allegations are specifically denied.

36.    Denied.

## SECOND CAUSE OF ACTION
### (Breach of the 2004 Share Exchange Agreement)
### (Failure to Issue Additional Shares Owed Under Section 10.2)

37.    Defendant references and incorporates it responses to paragraphs 1-36 above.

38.    Denied.

39.    The allegations contained in Paragraph 39 state conclusions of law to which no response is required.  To the extent any response is required, the allegations are specifically denied.

40.    Denied.

4

## THIRD CAUSE OF ACTION

### (Breach of the 2005 Subscription Agreement)

41.    Defendant references and incorporates it responses to paragraphs 1-40 above.

42.    Denied.

43.    The allegations contained in Paragraph 43 state conclusions of law to which no response is required.  To the extent any response is required, the allegations are specifically denied.

44.    Denied.

## FOURTH CAUSE OF ACTION

### (Violation of U.C.C. § 8-401 (NRS 104.8401))

45.    Defendant references and incorporates it responses to paragraphs 1-44 above.

46.    Denied.

47.    PSI lacks information or knowledge sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 47.

48.    Denied.

49.    The allegations contained in Paragraph 43 state conclusions of law to which no response is required.  To the extent any response is required, the allegations are specifically denied.

50.    PSI lacks information or knowledge sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 50.

51.    PSI lacks information or knowledge sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 51.

52.    Denied.

53.    The allegations contained in Paragraph 53 state conclusions of law to which no response is required.  To the extent any response is required, the allegations are specifically denied.

54.    The allegations contained in Paragraph 54 state conclusions of law to which no response is required.  To the extent any response is required, the allegations are specifically denied.

5

## FIFTH CAUSE OF ACTION
### (Conversion)

55.    Defendant references and incorporates it responses to paragraphs 1-54 above.

56.    The allegations contained in Paragraph 54 state conclusions of law to which no response is required.  To the extent any response is required, the allegations are specifically denied.

57.    Denied.

58.    Denied.

59.    Admitted.

60.    The allegations contained in Paragraph 60 state conclusions of law to which no response is required.  To the extent any response is required, the allegations are specifically denied.

## SIXTH CAUSE OF ACTION
### (Unjust Enrichment)

61.    Defendant references and incorporates it responses to paragraphs 1-60 above.

62.    PSI lacks information or knowledge sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 62.

63.    Denied.

64.    The allegations contained in Paragraph 64 state conclusions of law to which no response is required.  To the extent any response is required, the allegations are specifically denied.

65.    The allegations contained in Paragraph 65 state conclusions of law to which no response is required.  To the extent any response is required, the allegations are specifically denied.

## SEVENTH CAUSE OF ACTION
### (Injunctive Relief)

66.    Defendant references and incorporates it responses to paragraphs 1-65 above.

67.    Denied.

68.    Denied.

69.    Denied.

70.    Denied.

6

71.    Denied.

72.    Denied.

### EIGHTH CAUSE OF ACTION

### (Declaratory Relief)

73.    Defendant references and incorporates it responses to paragraphs 1-72 above.

74.    It is admitted that PSI issued a statement that the shares were cancelled.

75.    PSI lacks information or knowledge sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 75.

76.    Admitted.

### NINTH CAUSE OF ACTION

### (Equitable Indemnity)

77.    Defendant references and incorporates it responses to paragraphs 1-76 above.

78.    PSI lacks information or knowledge sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 78.

79.    Denied.

80.    Denied

### AFFIRMATIVE DEFENSES

### First Affirmative Defense

FWAG's Complaint fails to state a claim upon which relief can be granted.

### Second Affirmative Defense

FWAG materially breached the 2004 Share Exchange Agreement.

### Third Affirmative Defense

FWAG's claims are barred by fraud, as is described in PSI's Counterclaim below.

### Fourth Affirmative Defense

FWAG's claims are barred because the agreements upon which they are premised are unenforceable for failure of and/or lack of consideration.

7

### Fifth Affirmative Defense

FWAG's claims are barred because the agreements upon which they are premised are unenforceable for unilateral mistake with fraud or mutual mistake.

### Sixth Affirmative Defense

FWAG's claims are barred, in whole or part, given the non-existence of a condition precedent to the transfer of certain shares under each and every alleged agreement.

### Seventh Affirmative Defense

FWAG's claims are barred, in whole or part, because the agreements upon which they are premised are unenforceable for illegality.

### Eighth Affirmative Defense

FWAG's claims are barred, in whole or part, because the Subscription Agreements on which they are premised (in part) are void as a matter of corporate law.

### Ninth Affirmative Defense

FWAG's claims are barred, in whole or part, by estoppel.

### Tenth Affirmative Defense

FWAG's claims are barred, in whole or part, by the doctrine of unclean hands.

### Eleventh Affirmative Defense

FWAG's claims are barred, in whole or part, given FWAG's failure to mitigate its damages.

### Twelfth Affirmative Defense

FWAG's claims are barred, in whole or part, as certain acts allegedly undertaken by PSI were undertaken or failed to be undertaken when FWAG and its appointed/allied directors on the PSI board of directors controlled the Company's affairs.

### Thirteenth Affirmative Defense

FWAG's claims are barred, in whole or part, as certain acts or failure to act on the part of PSI that give rise to the alleged damages were undertaken or failed to be undertaken when FWAG and its appointed/allied directors on the PSI board of directors controlled the Company.

8

**Fourteenth Affirmative Defense**

FWAG's claims are barred, in whole or part, as certain PSI corporate acts giving rise to FWAG's claims were *ultra vires* or otherwise violated the Nevada Corporate Code.

**Fifteenth Affirmative Defense**

FWAG's claims are barred by reason of the facts and causes of action alleged in Defendant's counterclaims appearing below.

**Sixteenth Affirmative Defense**

FWAG's claimed are barred, in whole or part, because Defendant is entitled to a set-off or recoupment by reason of the facts and causes of action alleged in Defendant's counterclaims appearing below.

**Seventeenth Affirmative Defense**

FWAG's claims are barred, in whole or part, by the doctrine of laches.

**Eighteenth Affirmative Defense**

FWAG's claims are barred, in whole or part, by the applicable statutes of limitation.

**Nineteenth Affirmative Defense**

FWAG's claims are barred, in whole or part, by the doctrine of waiver.

**Twentieth Affirmative Defense**

FWAG's claims are barred, in whole or part, because the convertible bond offering described in FWAG's Complaint violated the United States securities laws.

## COUNTERCLAIMS

Nature of Counterclaims

81.    These counterclaims concern, and seek to undo, a fraud perpetrated on PSI (f/k/a Friendlyway Corporation; f/k/a Biofarm, Inc.) by FWAG and several persons and entities acting with it or at its direction.

82.    In December 2004, PSI, a public company, acquired friendlyway, Inc. ("FWI"), a private company, from friendlyway AG ("FWAG") and others, in a stock-for-stock merger valued at $9 million. FWI was a wholly-owned subsidiary of FWAG. FWAG sought public company status

9

to gain access to public financing, to fund a failing and unprofitable business. PSI, which at the time was such a public "shell" company, was a perfect candidate.

83. To convince PSI to acquire their business, however, FWAG resorted to fraud. Over the course of nearly a year, FWAG, through its employees and/or agents, repeatedly represented to PSI that FWI's business was growing, that it was earning a profit, that its balance sheet was balanced, that FWI had earned record revenues by the time of the merger, that they already had arranged for additional investors to join after the merger, that they had no intentions to further distribute the stock they would receive in the merger, and that they would not dilute the investment of PSI's original, existing shareholders.

84. Each of these repeated representations was false when made. Indeed, the company FWAG delivered to PSI was on its deathbed. Its balance sheet was dramatically out of balance, it had posted a record *loss* for the year of supposed record revenues, and it had incurred significant and extraordinary liabilities and expenses. In short, in exchange for its $9 million, PSI received nothing. In fact, it received worse.

85. FWAG's fraud was successful. Relying on its misrepresentations, PSI consummated the merger, acquired all the stock of FWI, and issued 18 million shares (or $9 million worth) to FWAG and its allied co-stockholders in FWI.

86. PSI seeks to rescind the merger and return the FWI stock to FWAG, based on FWAG's wrongdoing, as is alleged in more detail below. In the alternative, PSI seeks damages, including the $9 million merger price.

<u>Parties</u>

87. Plaintiff, Counterclaim-Defendant FWAG is a German corporation, with its principal place of business in Unterfoehring, Germany.

88. Defendant, Counterclaim-Plaintiff PSI Corporation is a Nevada corporation with its principal place of business in Colorado Springs, Colorado.

Jurisdiction and Venue

89.     This Court has subject-matter jurisdiction of this counterclaim, because certain of the claims in this action arise under the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 77-78 *et seq.* The Court also has subject-matter jurisdiction of this counterclaim under the Court's supplemental jurisdiction. 28 U.S.C. § 1367.

90.     Venue is proper in this district because a substantial part of the events and omissions that give rise to this counterclaim occurred in this district.

Intra-district Assignment

91.     Pursuant to Civil Local Rule 3-2(c), assignment to the San Francisco Division of the United States District Court for the Northern District of California is appropriate, because a substantial part of the events and damages giving rise to this action occurred in the City and County of San Francisco, and because the parties have consented to its exclusive jurisdiction for claims that arise in this action.

Factual Allegations

92.     FWI was incorporated in 2000 as a privately-held, Delaware corporation, located in San Francisco. FWI provided electronic self-service systems to businesses. In 1998, Alex von Welczeck joined FWI, as a director and its Chief Executive Officer.

93.     Originally, FWI was the wholly-owned subsidiary of FWAG. In 2002, however, von Welczeck purportedly conducted a management buy-out of a majority of FWI's stock. As a result of that transaction, as of 2003, von Welczeck owned 70% of FWI's stock, and FWAG owned 30%. Upon information and belief, von Welczeck paid very little consideration to FWAG for this controlling block of stock. FWAG's Chief Executive Officer, Klaus Trox, remained as one of FWI's directors.

94.     Henry Lo joined FWI in early 2004, as a director and its Chief Financial Officer.

95.     As of at least the beginning of 2004, FWI was revenue-positive but ultimately unprofitable. Von Welczeck, Lo, and FWAG concluded that, to resuscitate FWI and earn a return on their investment, they must secure access to public financing for their operations. Accordingly, they

11

began to seek transactions that would allow such access for FWI. In particular, they sought a "reverse merger" with a public "shell" company, where FWI would become a subsidiary of the "shell," and its assets and operations would become those of the once-empty "shell."

96.     At that time, PSI (which then was known as Biofarm, Inc.) was precisely such a public "shell" company. By 2004, PSI had divested itself of any meaningful operations. In 2004, PSI itself was seeking an acquisition partner, through which it could obtain profitable or potentially profitable operations.

97.     Upon information and belief, von Welczeck and Lo engaged certain persons and entities to act as "finders" for FWI in its search for a merger partner, including Michael Draper. Acting as "finder," Draper generated interest between FWI and PSI.

98.     Beginning in March 2004 and continuing through August 2004, PSI conducted negotiations with von Welczeck and Lo and communicated with them about the proposed transaction, including topics such as the terms of the deal, the current and projected financial condition of FWI, and von Welczeck's, Lo's, and FWAG's intentions with respect to PSI and its stock, once they controlled PSI.

99.     Throughout the negotiations, von Welczeck and Lo, acting together and with the knowledge and consent of FWAG, continually made misrepresentations of material fact, designed to assuage PSI's concerns and convince PSI to consummate a merger on terms favorable to them. Lo served as the sellers' lead spokesman, and he represented to PSI that he spoke for FWI and its shareholders (including FWAG).

100.     In particular, on March 31, 2004, Lo represented to PSI that FWAG, which was a more established company, was likely to merge with, acquire, or otherwise invest in FWI, once it was combined with PSI.

101.     Also on March 31, 2004, Lo represented to PSI that he and von Welczeck currently believed that FWI was performing at a rate that would generate $3.5 million in total revenue in 2004. In particular, according to Lo's representations, FWI's management believed that FWI would generate most of its revenue and profit in the second half of 2004, including $1.5 million in revenue

12

in the fourth quarter alone. Lo stated that, by the end of 2004, FWI would be earning revenue at a rate of $6 million per year. This representation was critical, for it served as the basis for the $9,000,000 merger price demanded by FWAG, von Welczeck, and Lo, which Lo based on a 1.5 multiple of annual revenues.

102.    On May 26, 2004, Lo represented to PSI that FWI had arranged for new investors to further finance PSI once the merger was completed. Lo projected that, once the merger occurred, PSI quickly would attain an enterprise value of $20 to $30 million.

103.    On July 15, 2004, as part of the due diligence process, Lo sent financial statements to PSI, showing FWI's financial performance and condition for year-end 2003 and the six-month period ended June 30, 2004. He also included pro forma financial statements for the nine-month period ended September 2004 and year-end December 2004. In these financial statements, Lo represented that, as of June 30, 2004, FWI had earned a net profit. He also reiterated that FWI would earn $3.5 million revenue by the end of the year, with an annualized revenue rate of $5 million. Lo further represented management's current belief that, by year-end, FWI's assets would exceed its liabilities by 53%.

104.    On July 21, 2004, Lo represented to PSI that FWAG, von Welczeck, and he already had arranged for additional financing for PSI, once the merger was completed, through a PIPE (Private Investment in Public Equity) offering immediately after the merger.

105.    On July 21, 2004, Lo also stated that the "fundamentals" of FWI's business – i.e., the business FWAG, von Welczeck, and Lo wanted PSI to purchase – were "stronger than ever" and were profitable.

106.    On August 4, 2004, Lo represented to PSI that he knew that, after the closing of the merger, FWAG would merge with or significantly invest in PSI. Lo repeated this representation to PSI on August 12, 2004.

107.    On August 4, 2004, Lo represented that FWI was currently profitable, and he used that representation to demand a premium price to be paid to the FWI shareholders by PSI.

13

108.    On August 13, 2004, relying on the representations of Lo, von Welczeck, and FWAG, PSI entered into a Share Exchange Agreement ("SEA") with FWAG, von Welczeck, and FWI, providing for the acquisition of FWI by PSI. The SEA provided that PSI would acquire all of FWI's stock from von Welczeck and FWAG, in exchange for 18,000,000 new shares of PSI's stock. The 18,000,000 shares, which then were valued at 50 cents per share, represented the $9,000,000 price that Lo, von Welczeck, and FWAG had demanded, based on their representation that FWI was generating revenue at a rate of $6 million per year.

109.    In the SEA, FWI, von Welczeck, and FWAG made several additional representations to PSI. In pertinent part, the SEA provides:

(a)    FWI, through von Welczeck, represented that it had delivered financial statements for the years ended December 31, 2002 and 2003 and for the six-month period ended June 30, 2004, and that those financial statements accurately represented the financial condition and operating results of FWI. They further represented that, between June 30, 2004 and the execution of the SEA, there had not been a material adverse change in the financial condition depicted in those financial statements.

(b)    FWI, through von Welczeck, represented that, between June 30, 2004 and the execution of the SEA, there had not been a material change to any material agreement to which FWI was bound, or the incurring of indebtedness or liability individually in excess of $25,000 or aggregately in excess of $100,000.

(c)    FWAG and von Welczeck represented that they intended to acquire PSI's stock for their own account and did not intend to sell or distribute PSI's stock.

(d)    FWAG and von Welczeck covenanted that, between the execution of the SEA and the closing, FWI's operations would continue in their ordinary course. In particular, they covenanted that FWI would not incur any long-term or short-term debt securities or enter into any extraordinary contracts. They also covenanted that FWI would continue to pay its accounts payable consistent with past practice.

14

(e)    FWAG and von Welczeck covenanted that they and FWI would pay their own expenses in connection with the merger transaction.

110.    After the execution of the SEA, PSI continued its due diligence of FWI and communications with its shareholders, directors, and officers. FWAG, von Welczeck, and Lo, again with Lo acting as the sellers' primary spokesperson, continued to make representations designed to induce PSI to consummate the merger transactions.

111.    On August 20, 2004, FWAG, through Klaus Trox and Lo, represented that it intended to merge into PSI, once it acquired FWI.

112.    On August 30, 2004, with one month remaining in FWI's third quarter, Lo represented to PSI that "[w]e are on pace to generate revenue in excess of $1 million for Q3, which will be another record performance for friendlyway." Lo claimed that, "upon closing," "we will have on file quarterly financial statements that will not only reflect strong revenue growth, but profitability." This statement was false when made as any reasonable appraisal of FWI's financial information would not support this factual statement or it was undertaken with a reckless indifference to its truth or falsity in that Lo did not consult or evaluate FWI's financial information.

113.    On October 7, 2004, FWI and FWAG represented to PSI that, for the nine-month period ended September 30, 2004, FWI had earned an operating profit, a positive net income, and $2,019,300 in revenue. FWI and FWAG also represented that, during the third quarter, it had "strengthened [its] balance sheet." FWI and FWAG also represented that, for this nine-month period, FWI had incurred operating expenses of $730,425. They also projected an additional $1.1 to $1.3 million in revenue for the fourth quarter of 2004 and expressed their expectation that FWI would continue to operate profitably for the remainder of 2004. This statement was false when made as any reasonable appraisal of FWI's financial information would not support this factual statement or it was undertaken with a reckless indifference to its truth or falsity in that agents acting for FWI and FWAG did not consult or evaluate FWI's financial information.

114.    Between the execution of the SEA and the closing, PSI sought additional agreements and assurances from von Welczeck, Lo, and FWAG that, in their zeal to arrange additional financing

15

for the combined entity after the merger, they would not sell PSI's stock below a certain price. PSI sought these assurances to protect the original investment of its current shareholders. On November 16, 2004, the sellers, through Lo, agreed with PSI that they would not issue or otherwise distribute PSI's stock unless the stock had been trading for at least 30 days at a price equal to or higher than 75 cents per share and would not do so for less than 50 cents per share.

115.    On December 10, 2004, relying on these representations, PSI and FWI entered into a Closing Agreement, consummating the merger transaction.

116.    The Closing Agreement recognized that, after the execution of the SEA, FWI had issued stock to the following additional shareholders: Lo; Derma Plus, Inc.; Karl Johannsmeier (who was a FWAG shareholder) and Pacific Capsource, Inc. The Closing Agreement provided that, accordingly, these new FWI shareholders would exchange their FWI stock for PSI's stock in the merger transaction. The Closing Agreement amended the SEA to include these new shareholders as selling FWI shareholders and to impose the same obligations upon them as imposed by the SEA upon von Welczeck and FWAG.

117.    In connection with the December 10, 2004 closing, von Welczeck and Lo, as officers of FWI, certified in writing to PSI that the representations, warranties, and covenants in the SEA concerning FWI remained true as of the date of the closing.

118.    In connection with the December 10, 2004 closing, FWAG, Lo, von Welczeck, and Draper (acting on behalf of Derma Plus), certified in writing to PSI that their representations and warranties in the SEA as FWI shareholders, including those regarding their intent to sell PSI's stock, remained true as of the date of the closing.

119.    PSI relied on these representations in entering into the Closing Agreement and consummating the merger transaction.

120.    As provided in the SEA, after the closing, PSI issued 18,000,000 shares of restricted common stock, valued at $9,000,000, to the shareholders of FWI, in exchange for all of the outstanding shares of FWI. Von Welczeck received 8,659,999 shares. FWAG received 6,000,001

16

shares.  Lo received 900,000 shares.  Derma Plus received 340,000 shares.  Pacific Capsource received 1,100,000 shares.  Johannsmeier received 1,000,000 shares.

121.    After the closing, FWAG, von Welczeck, and Lo took control of PSI's board of directors.  Von Welczeck became PSI's new CEO, and Lo became PSI's new CFO.  PSI's directors as of the time of the merger soon resigned.

122.    This massive stock issuance and change of control, however, was premised on and caused by a coordinated fraud.  The several and repeated material representations described above of Lo, Von Welczeck, FWAG, and Draper, upon which PSI relied in entering into the merger, were knowingly false when made.

123.    Specifically, FWAG repeated representations that the financial statements provided to PSI accurately depicted the financial condition of FWI at the time of the closing were false.  Those financial statements depicted a solvent company with assets in balance with its liabilities.  In reality, however, the company Defendants delivered to PSI was dramatically unbalanced and unhealthy, with liabilities *nearly* double the size of its assets.

124.    The financial statements also depicted a company that was operating at a profit and earning a positive net income.  In reality, by the time of the closing, FWI had incurred a record *loss* for 2004.

125.    Moreover, the financial statements delivered to PSI did not accurately depict the liabilities of FWI.  As of the time PSI acquired FWI, FWAG and its allied co-stockholders caused FWI to incur substantial liabilities that were never disclosed to PSI.  For example, these individuals deliberately concealed the fact that they had not paid for the services of FWI's own merger counsel, and they deceitfully delivered FWI to PSI encumbered by that liability.

126.    For the same reason, FWAG's repeated representations to PSI that, between June 30, 2004 and the closing, FWI would not incur and had not incurred individual liabilities in excess of $25,000 or more than $100,000 in total liability, would operate FWI as usual, and would continue to pay its accounts payable, were false.

17

127.    FWAG's repeated representations concerning FWI's revenue and profitability also proved false. In truth, FWI earned approximately $2.2 million in revenue in 2004. Thus, the sellers' representations that FWI was earning $3.5 million for 2004 were false. That FWAG maintained this representation until the closing in December 2004 alone shows that FWAG knew these representations were false.

128.    In particular, the repeated representations about the financial condition and performance of FWI between June 30, 2004 and the December 2004 closing were knowingly false. Contrary to the representation that FWI would earn approximately $2.3 million in revenue in the second half of 2004 and $1.5 million in the fourth quarter alone, FWI only earned approximately $1 million in revenue *during the entire second half of 2004*. Nevertheless, FWAG maintained FWI's revenue projections up until the closing at the end of the year. It did so to convince PSI that it was acquiring a company that earned $1.5 million in revenue per quarter, or $6 million per year. It was upon this critical representation that FWAG continued to justify their $9 million purchase price until closing. In reality, which Defendants knew at the time, FWI completed 2004 earning approximately $500,000 in revenue per quarter.

129.    Indeed, in October 2004, *after the end of the third quarter*, FWI represented that it *already had earned* close to $2.1 million in revenue, had incurred only $730,425 in operating expenses, and was profitable. In truth, which FWAG knew at the time, FWI had not earned $2.1 million in revenue by the end of the third quarter, had incurred nearly $1.2 million in operating expenses, and was operating at a significant loss.

130.    Similarly, Lo's August 30, 2004 representation that FWI "was on pace" to earn more than $1 million in revenue for the third quarter, which he made with just one month left in the quarter at issue, was knowingly false. Indeed, FWI only earned only approximately $1 million in revenue *during the entire second half of 2004*.

131.    FWAG's representations and promises concerning their intent to distribute PSI's stock also were false when made. As described in its Complaint, soon after gaining control of PSI, FWAG caused PSI to distribute PSI's stock at prices well below 50 cents a share to, non-US

18

citizens.  Moreover, just weeks after the closing – *i.e.*, just weeks after confirming its representation that it did not intend to distribute PSI's stock – FWAG entered into an agreement to distribute PSI's stock to third parties.

### COUNTERCLAIM I
### Violation of § 10(b) of the Exchange Act
### and Rule 10b-5 Promulgated Thereunder

132.    PSI repeats, reasserts and incorporates by reference the aforementioned allegations contained in this counterclaim.

133.    During the period prior to execution of the SEA and during and prior to the Closing Agreement, FWAG carried out a plan, scheme, and course of conduct which was intended to, and did, deceive PSI as alleged in this counterclaim, caused PSI to enter into the SEA and Closing Agreement, and PSI to sell stock.  In furtherance of this unlawful scheme, plan, and course of conduct, FWAG made the misrepresentations and omissions and took the actions set forth herein.

134.    FAWG: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements made not misleading; and (c) engaged in acts, practices, and courses of conduct which operated as a fraud and deceit upon PSI to cause PSI to enter into the SEA and Closing Agreement, and to sell stock.

135.    FWAG had actual knowledge of the misrepresentations and omissions of material facts set forth in this counterclaim, or acted with reckless disregard of the truth in that they failed to ascertain or disclose such facts, even though facts were available to them.

136.    The materially false and misleading representations of FWAG and its failure to disclose material facts, as set forth above, caused PSI to enter into SEA and Closing Agreement, and sell stock.  PSI would not have entered into the SEA and/or the Closing Agreement upon the same terms, if at all, except for the materially false and misleading representations of FWAG and the failure of FWAG to disclose material facts as set forth in this counterclaim.

137.    By virtue of the foregoing, FWAG has violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

19

138.    FWAG's violation of Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder, resulted in significant injury to PSI.

## COUNTERCLAIM II
### Violation of Section 20(a) of the Exchange Act

139.    PSI repeats, reasserts and incorporates by reference the aforementioned allegations contained in this counterclaim.

140.    FWAG acted as controlling person of FWI within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of its stockholder position and the ability to designate a director, participation in, and/or awareness of FWI's operations and/or intimate knowledge of the false statements made by FWI as set forth herein, FWAG had the power to influence and control and did influence and control, directly or indirectly, the decision-making of FWI including the content and dissemination of various statements which PSI alleges are false and misleading.  FWAG was provided with and had access to copies of FWI's reports, financial statements, and other statements alleged by PSI to be misleading prior to and/or shortly after these statements and information were provided to PSI and had the ability to prevent the issuance of the statements and information or cause the statements and information to be corrected.

141.    In addition, FWAG had direct and/or supervisory involvement in the operations of FWI and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations alleged herein.  As set forth above, FWAG, von Welczeck, Lo and Draper each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this counterclaim.  By virtue of its position as controlling person, FWAG is liable pursuant to Section 20(a) of the Exchange Act.

142.    As a direct and proximate result of FWAG's wrongful conduct, PSI suffered damages in connection with the issuance of its securities pursuant to the SEA and Closing Agreement and the acquisition of Defendants' shares of FWI.

### COUNTERCLAIM III
### Rescission Under § 29(b) of the Exchange Act

143.    PSI repeats, reasserts and incorporates by reference the aforementioned allegations contained in this counterclaim.

144.    The SEA, the Closing Agreement, and the transactions that were consummated pursuant to the SEA and Closing Agreement involved prohibited transactions within the meaning of Section 29(b) of the Exchange Act.  PSI is in contractual privity with FWAG under the SEA and Closing Agreement, and PSI is in the class of persons that the Securities Act and the Exchange Act were designed to protect.

145.    PSI is entitled to have the SEA and Closing Agreement, and the exchange of securities with FWAG pursuant thereto rescinded, since PSI would not have entered into the SEA and/or the Closing Agreement, or consummated the transactions pursuant thereto except for the misrepresentations and omissions of FWAG as described herein.

146.    Since consummation of the closing under the SEA and Closing Agreement, FWI has been and continues to be a wholly owned subsidiary of PSI, and upon rescission, PSI is able to return to each of the parties to the SEA and/or the Closing Agreement – *i.e.* FWAG, von Welczeck, Lo and Draper – the shares of FWI which were held by each party to the  SEA and/or the Closing Agreement prior to the closing.

147.    Rescission of the SEA and Closing Agreement, and of the exchange of securities provided for therein is necessary to provide PSI with complete relief and to return the parties to the same position they would have been in if PSI had been aware of the misrepresentations and omissions prior to the time it entered into the SEA and/or Closing Agreement.

148.    As a direct and proximate result of the complained of conduct, PSI suffered economic injuries and, pursuant to Section 29(b) of the Exchange Act, is entitled to rescission or damages, together with interest, in amount to be proven at trial.

**ANSWER, AFFIRMATIVE DEFENSES AND COUNTERCLAIM**
**CASE NO. 3:07-CV-02990-MEJ**

## COUNTERCLAIM IV
### Violation Of Section 25401
### Of the California Corporation Code

149.    PSI repeats, reasserts and incorporates by reference the aforementioned allegations contained in this counterclaim.

150.    FWAG made, for the purpose of inducing the purchase or sale of securities by others, oral and written statements which included untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

151.    PSI did not know the facts concerning the untruths or omissions of FWAG.

152.    FWAG failed to exercise reasonable care and/or knew of the untruths or omissions complained of.

153.    As a direct and proximate result of the complained of conduct, PSI suffered economic injuries and, pursuant to section 25501 of the California Corporations Code, is entitled to rescission or damages, together with interest, in amount to be proven at trial.

## COUNTERCLAIM V
### Fraudulent Misrepresentation

154.    PSI repeats, reasserts and incorporates by reference the aforementioned allegations contained in this counterclaim.

155.    FWAG made the false representations detailed in this counterclaim.

156.    FWAG made these representations in order to induce PSI into entering into the SEA and Closing Agreement.

157.    The materially false and misleading representations of FWAG and its failure to disclose material facts, as set forth above, caused PSI to enter into SEA and/or Closing Agreement, and sell stock.

22

158.    PSI would not have entered into the SEA and/or Closing Agreement upon the same terms, if at all, except for FWAG's materially false and misleading representations and the failure of FWAG to disclose material facts as set forth in this counterclaim.

159.    PSI justifiably relied on these representations, because had PSI known the truth which was disclosed by FWAG, PSI would not have entered into or consummated the transactions contemplated under the SEA and/or Closing Agreement, or would have done so under substantially less favorable terms to the other parties to those agreements.

160.    As a direct and proximate result of the complained of conduct, PSI suffered economic injuries.

**COUNTERCLAIM VI**
**Breach of Contract**

161.    PSI repeats, reasserts and incorporates by reference the aforementioned allegations contained in this counterclaim.

162.    On August 20, 2004, PSI and von Welczeck, FWI and FWAG entered into the SEA.

163.    In the SEA, FWI, von Welczeck, and FWAG represented:

(a)    FWI, through von Welczeck, represented that it had delivered financial statements for the years ended December 31, 2002 and 2003 and for the six-month period ended June 30, 2004, and that those financial statements accurately represented the financial condition and operating results of FWI.  They further represented that, between June 30, 2004 and the execution of the SEA, there had not been a material adverse change in the financial condition depicted in those financial statements.  FWAG knew or should have known that these representations were false or misleading.

(b)    FWI, through von Welczeck, represented that, between June 30, 2004 and the execution of the SEA, there had not been a material change to any material agreement to which FWI was bound, or the incurring of indebtedness or liability individually in excess of $25,000 or aggregately in excess of $100,000.  FWAG knew or should have known that these representations were false or misleading.

23

(c)    FWAG and von Welczeck represented that they intended to acquire PSI's stock for their own account and did not intend to sell or distribute PSI's stock.

(d)    FWAG and von Welczeck covenanted that, between the execution of the SEA and the closing, FWI's operations would continue in their ordinary course.  In particular, they covenanted that FWI would not incur any long-term or short-term debt securities or enter into any extraordinary contracts.  They also covenanted that FWI would continue to pay its accounts payable consistent with past practice.

(e)    FWAG and von Welczeck covenanted that they and FWI would pay their own expenses in connection with the merger transaction.

164.    FWAG breached its contractual obligations as set forth in the previous paragraph of this counterclaim.

165.    FWAG also agreed with PSI that they would not issue or otherwise distribute PSI's stock unless the stock had been trading for at least 30 days at a price equal to or higher than 75 cents per share and would not do so for less than 50 cents per share.  FWAG breached this contractual obligation.

166.    As a direct and proximate result of the complained of conduct, PSI suffered economic injuries.

## COUNTERCLAIM VII
### Constructive Trust

167.    PSI repeats, reasserts and incorporates by reference the aforementioned allegations contained in this counterclaim.

168.    As is stated above, FWAG committed securities violations, committed common law fraud, and breached its agreements with PSI.

169.    FWAG, now in possession in PSI's stock, can continue to harm PSI unless possession, custody and control of the stock is withheld from FWAG.

170.    If FWAG sells PSI's stock or further pledges or encumbers the stock, this will cause irreparable injury to Counterclaim and PSI.

24

171.    PSI has no adequate remedy at law.


WHEREFORE, PSI, by and through its attorneys, respectfully requests that this Court:

(a)    Enter judgment against Plaintiff / Counterclaim-Defendant FWAG on all counterclaims;

(b)    Order that FWAG's stock in PSI be held in constructive trust for the benefit of the other stockholders in the Company until such time as this counterclaim can be fully and finally adjudicated;

(c)    Rescind the SEA and Closing Agreement and Order Plaintiff / Counterclaim-Defendant FWAG to return its PSI stock to PSI and account for any interest due and owing;

(d)    Award PSI damages, including direct, indirect, consequential and punitive damages as appropriate;

(e)    Order Plaintiff / Counterclaim-Defendant FWAG to pay PSI's attorney's fees and costs in pursuing this matter; and

(f)    Grant such other and further relief this Court deems just and proper under the circumstances.

Dated: June 19, 2007

Daniel D. Harshman (SBN# 177139)
COZEN O'CONNOR
425 California Street, 24th Floor
San Francisco, CA 94104
E-mail: dharshman@cozen.com
Telephone: (415) 617-6100
Facsimile: (415) 617-6101

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*Of Counsel:*
George M. Gowen III
David Felice
COZEN O'CONNOR
1900 Market Street
Philadelphia, PA  19103
215.665.2000 (tel.)
215.665.2013 (fax)
*ggowen@cozen.com*

*Attorneys for Defendant / Counterclaim*
*Plaintiff PSI Corporation*

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all claims.

Dated: June 19, 2007

Daniel D. Harshman (SBN# 177139)
COZEN O'CONNOR
425 California Street, 24th Floor
San Francisco, CA  94104
E-mail:  dharshman@cozen.com
Telephone:  (415) 617-6100
Facsimile: (415) 617-6101

*Of Counsel:*
George M. Gowen III
David Felice
COZEN O'CONNOR
1900 Market Street
Philadelphia, PA  19103
215.665.2000 (tel.)
215.665.2013 (fax)
*ggowen@cozen.com*

*Attorneys for Defendant / Counterclaim*
*Plaintiff PSI Corporation*

26

1

2

## CERTIFICATE OF SERVICE

3    I, the undersigned, declare:  I am a resident of the State of California, over the age of eighteen years, and not a party to the within action.  I am employed in the County of San Francisco, California, in which county the within mentioned service occurred.  My business address is Cozen

4    O'Connor, 425 California Street, Suite 2400, California, CA 94104.

5    On the date set forth below, I served the foregoing document(s) on the parties, through their attorneys of record, addressed as set forth below:

6

**ANSWER, AFFIRMATIVE DEFENSES AND COUNTERCLAIM**

7

8    **[ X ]    (By First Class Mail)**  I caused each such envelope, with first-class postage thereon fully prepaid, to be deposited in the United States mail at San Francisco, California.

9    **[   ]    (By Facsimile)**  I caused each individual on the attached list to be served via facsimile to the numbers indicated on the attached Service List.

10

11    **[   ]    (By Personal Service)**  I caused each such envelope, with courier charges prepaid, if applicable, to be personally delivered by messenger and/or in-house messenger to the offices of each addressee.

12

13    **[   ]    (By Federal Express/UPS)**  I caused each such envelope, with shipping charges fully prepaid, to be delivered to a Federal Express/UPS pick up box at San Francisco, California for next business day delivery.

14

15    Lawrence A. Weiss
Heller Ehrman, LLP

16    275 Middlefield Road
Menlo Park, CA  94025-3506

17    Telephone:  650-324-7000
Facsimile:  650-324-0638

18    Email: Lawrence.weiss@hellerehrman.com

19    I am readily familiar with the firm's practice of collection and processing correspondence for mailing.  Under that practice it would be deposited with the United States Postal Service on that

20    same day with postage thereon fully prepaid in the ordinary course of business.  I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter

21    date is more than one day after date of deposit for mailing in affidavit.

22    I declare that I am employed in the office of a member of the Bar of this Court at whose direction the service was made.  I declare under penalty of perjury under the laws of the United

23    States of America and of the State of California that the foregoing is true and correct.

24    Executed June 19, 2007, at San Francisco, California.

25    By: _____

26                      Lisa S. Ward

27

28